1  HEATHER E. WILLIAMS, #122664
   Federal Defender
2  ANN C. McCLINTOCK, #141313
   Assistant Federal Defender
3  801 I Street, 3rd Floor
   Sacramento, CA  95814
4  Tel:  916.498.5700

5
   Attorneys for Defendant
6  CLIFFORD J. BRIGHAM

7
                    IN THE UNITED STATES DISTRICT COURT
8
                 FOR THE EASTERN DISTRICT OF CALIFORNIA
9

10

   UNITED STATES OF AMERICA,        )  Case No.  1:17-cr-00309-1 &
11                                   )             1:17-cr-00308-1
                Plaintiff,           )
12                                   )  **MOTION TO REDUCE SENTENCE**
                                     )  **PURSUANT TO 18 U.S.C.**
13       v.                          )  **§ 3582(c)(1)(A)(i)**
                                     )
14   CLIFFORD J. BRIGHAM,            )
                                     )
15              Defendant.           )
   _____  )
16

17

18

19

20

21

22

23

24

25

# TABLE OF CONTENTS

Table of Authorities..................................................................................................ii

I.      INTRODUCTION..................................................................................1

II.     JURISDICTION.....................................................................................3

III.    SENTENCE REDUCTION AUTHORITY UNDER
        18 U.S.C. § 3582(C)(1)(A)(i)................................................................4

IV.     RELEVANT FACTS AND PROCEDURAL HISTORY.......................5

        A.  Sentencing Background Facts.......................................................5

        B.  Facts Showing Compelling and Extraordinary Circumstances ........7

            1.  Mr. Brigham has Programmed Well in Prison ....................7

            2.  Mr. Brigham's Medical Condition ......................................8

            3.  COV-19 Dangers to Prisoners Over 60 and with
                Underlying Chronic Medical Issues ................................. 15

        C.  Mr. Brigham's Serious Medical Conditions And Deteriorating
            Physical Health Because Of The Aging Process Constitute
            Extraordinary And Compelling Reasons Warranting
            A Sentence Reduction................................................................. 16

        D.  Release Plan.............................................................................. 22

V.  ARGUMENT.............................................................................................23

    A.  MR. BRIGHAM HAS ESTABLISHED EXTRAORDINARY AND
        COMPELLING REASONS WARRANTING A
        SENTENCE REDUCTION........................................................23

    B.  The Amended Compassionate Release Statute Reflects a More Expansive
        Consideration for Compassionate Release .....................................25

VI. CONCLUSION.........................................................................................29

# TABLE OF AUTHORITIES

**Federal Cases**

*United States v. Bellamy*,
    2019 WL 3340699 (D. Minn. 2019)............................................................. 28

*United States v. Cantu*,
    2019 U.S. Dist. LEXIS 100923, 2019 WL 2498923 (SD TX June 17, 2019) .......... 2, 5

*United States v. McGraw,*
    2019 WL 2059488 (S.D. Ind. May 9, 2019) ................................................ 27

*United States v. Spears*,
    2019 WL 5190877 (D. Or. Oct. 15, 2019) .................................................. 26

*United States v. Walker*,
    2019 WL 5268752 (N.D. Ohio Oct. 17, 2019)............................................. 28

**Federal Statutes**

Title 18 United States Code
    § 994 ..................................................................................... 4
    § 3553 ............................................................................. passim
    § 3582 ........................................................................ 1, 2, 3, 4, 13
    § 4205 ..................................................................................... 4

First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018)
    § 603 ................................................................................. 3, 25

**Miscellaneous**

United States Sentencing Guidelines
    § 1B1.13 ........................................................................... passim

# I.   INTRODUCTION

Defendant CLIFFORD J. BRIGHAM, by and through his attorneys, respectfully moves this Court pursuant to the 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence to time served.  This request is based on Mr. Brigham's serious medical conditions and deteriorating physical health and his corresponding inability to provide self-care and obtain adequate medical treatment in prison.

Mr. Clifford sought administrative relief from the Bureau of Prisons (BOP) by requesting that BOP ask this Court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), or, alternatively, that it reduce it under the "Elderly Inmates with Medical Conditions" provisions of Program Statement 5050.050, § 4(b).[1]  *See* Letter of January 14, 2020; Exhibit 3.  The Warden found Mr. Brigham suffered from the medical conditions he outlined in his request, but concluded that these conditions "are currently and will continue to be managed and monitored."  Warden's Denial Letter; Exhibit 2.  The Warden asserted Mr. Brigham had refused treatment, which is an incomplete and inaccurate statement.  The Warden also rejected Brigham's request because he had only served 41.9% of his 5-year term which it determined made Brigham "ineligible for Compassionate Release consideration at this time."  Exhibit 2.

It appears that the Warden failed to consider Brigham for compassionate release under § 3582(c)(1)(A)(i) and the U.S. Sentencing Guidelines § 1B1.13, application notes

---

[1] The BOP's program statement can be found on its website by searching for "5050" from the list of BOP Policies available at ULR: https://www.bop.gov/PublicInfo/execute/policysearch?todo=query# (last accessed March 13, 2020).

1(A)(ii)(I), (III); that is, BOP failed to consider whether Mr. Brigham presented extraordinary and compelling reasons based on him "suffering from a serious physical or medical condition" or "experiencing deteriorating physical or mental health because of the aging process." Both grounds were presented in Mr. Brigham's request for compassionate release. *See* Exhibit 3, especially pages 1, 5-7.

Pursuant to the First Step Act, this Court has jurisdiction to determine whether "extraordinary and compelling reasons" warrant a sentence reduction. It is up to this Court to determine whether "extraordinary and compelling reasons warrant such a reduction" in sentence. 18 U.S.C. § 3582(c)(1)(A)(i). While language in the statutes calls on the Court to consider the sentencing factors under 18 U.S.C. § 3553(a) and the Sentencing Commission's policy statement on reduction of sentence found in U.S.S.G. § 1B1.13, the Sentencing Commission has not updated this Guideline since the First Step Act permitted a defendant to bring a motion directly to the Court. This "Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1.13 cmt. n.1(A)-(C) warrant granting relief." *United States v. Cantu*, 2019 U.S. Dist. LEXIS 100923 *12, 2019 WL 2498923 *5 (SD TX June 17, 2019).

Mr. Brigham's circumstances present extraordinary and compelling circumstances whether viewed by the Sentencing Commission's standards for reduction of sentence or on a broader basis. His health situation is "[b]eyond what is usual, customary, regular, or common" and presents a compelling reason for relief – that is, he will suffer irreparable harm if relief is not granted. Mr. Brigham's serious physical or medical condition and deteriorating physical health fit the Guidelines' criteria for relief found in Application Note

1(A)(ii)(I) and (III) of U.S.S.G. § 1B1.13.  Mr. Brigham respectfully request that the Court grant the requested sentence reduction to time served.

## II.   JURISDICTION

On December 21, 2018, the President signed the First Step Act into law.  Among its criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a *defense* motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act of 2018, § 603(b), Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

Mr. Brigham submitted a request seeking compassionate release with the BOP via a letter dated January 14, 2020; Exhibit 3.  The Warden acknowledged receipt of this request.  Warden Denial, Jan. 23, 2020; Exhibit 2.  The Warden denied Brigham relief, but discussed only the criteria relevant to the elderly inmates with medical conditions. *Compare* Exhibit 2 *with* Program Statement 5050.050, subsection 4(b).  The facts and legal support for the administrative request are the same as those presented in this motion, save for additional facts that have arisen after the submission of the administrative request.

Given these facts, Mr. Brigham has properly submitted his request to the Warden and more than 30 days have now passed without a decision on the full request that Mr. Brigham made.  Specifically, the Warden appears to have failed to consider and address Brigham's eligibility for a reduction in sentence under the applicable guidelines and § 3582(c)(1)(A)(i).

### III.   SENTENCE REDUCTION AUTHORITY
### UNDER 18 U.S.C. § 3582(C)(1)(A)(i)

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i).  In relevant part, this statute authorizes the Court to "reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  As relevant here, the examples of "extraordinary and compelling reasons" included in U.S.S.G. § 1B1.13 include Mr. Brigham's circumstances: "The defendant is—suffering from a serious physical or medical condition [or] experiencing deteriorating physical health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, comment. n.1(A)(ii)(I), (III) (Nov. 1, 2018).

The Sentencing Commission's standard has parallels under the Bureau of Prisons (BOP) program statement on compassionate release, PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 USC§§ 3582 and 4205(g), at pp. 5-6 (Jan. 17, 2019)

Under the First Step Act, the BOP's program statement retains relevance only to the extent that its criteria are broader than the standards set by the Commission.  U.S.S.G.

4

§ 1B1.13, comment. n. l(D) (recognizing that the Director of the BOP can designate additional "extraordinary and compelling reason other than, or in combination with, the reasons described in" the commentary).  Though the Sentencing Commission has not updated section 1B1.13 since the First Step Act extended to defendants the right to request a compassionate release reduction in sentence, the extant section fully covers Mr. Brigham's situation as detailed next.  If this Court does not believe Mr. Brigham's situation is covered by the extant guidelines' provision, this Court nonetheless retains the authority under the new revisions to § 3562(c)(1)(A)(i) to grant a reduction in sentence if it concludes the circumstances are "extraordinary and compelling."  *See Cantu*, 2019 U.S. Dist. LEXIS 100923, *12, 2019 WL 2498923, *5.

**IV.**

**RELEVANT FACTS AND PROCEDURAL HISTORY**

**A.      Sentencing Background Facts**

On August 11, 2003, Clifford Brigham was sentenced by the United States District Court of Oregon to 37 months imprisonment after pleading guilty to making false statements on a loan application, making false statements to the U.S. Small Business Administration, and misuse of a social security number in case number 3:02-cr-00220-HA (Oregon district court docket entry no. 29; *see* ED CA 1:17-cr-00309-LJO, docket entry no. 18, p. 7 of 25).  The district court also imposed a five-year term of supervised release. *Id*.  While on appeal in this case, the government charged Mr. Brigham with several counts of wire fraud, mail fraud, money laundering, and social security fraud in case number 3:06-cr-00272-BR  (Oregon district court docket entry no. 112; *see* ED CA 1:17-cr-00308-LJO, docket entry no. 18, pp. 4-5).  After a jury trial, Mr. Brigham was convicted and sentenced

5

to serve 120 months, consecutive to his remaining sentence in 3:02-cr-00220-HA, and three years of supervised release, concurrent to the five years of supervised release in 3:02-cr-00220-HA. *United States v. Brigham*, 3:06-cr-00272-BR (Oregon district court docket entry no. 151; *see* ED CA 1:17-cr-00308-LJO, docket entry no. 18, p. 16 of 49).

Mr. Brigham's supervised release commenced on February 22, 2016. *United States v. Brigham*, ED CA 1:17-cr-00308-LJO, docket entry no. 1, p. 2 of 3.

On December 19, 2017, Mr. Brigham was arrested in the Eastern District of California on allegations that he had violated the terms of his supervised release. The District Court of Oregon transferred supervision in both cases to the Eastern District of California on December 28, 2017, as cases 1:17-cr-00308-LJO and 1:17-cr-00309-LJO. This Court detained Mr. Brigham on December 19, 2017 and he remained detained throughout the revocation proceedings.

On April 9, 2018, this Court revoked Mr. Brigham's terms of supervision in both cases. It sentenced Brigham to serve consecutive and maximum terms in prison -- 24 months in 1:17CR00308 and 36 months in 1:17CR00309, for a total of term of 60 months imprisonment. The United States Sentencing Guidelines called for a Guidelines range of 5-11 months in 1:17-cr-00308, docket entry no. 16, p. 7; and 8-14 months in 1:17-cr-00309, docket entry no. 16, p. 8. Brigham admitted two violations: a failure to submit truthful monthly reports to the United States Probation Officer in that Mr. Brigham had reported that he was unemployed when he was working for his own company, Genesis Capital Funding, LLC; a failure to notify probation of his change in employment; and associating with a prohibited person by a fellow supervised releasee. Dispositional Memo, pp. 3-5.

The Court dismissed an allegation that. Brigham engaged in unauthorized business.  *Id.* pp. 3-4.

**B.      Facts Showing Compelling and Extraordinary Circumstances**

      **1.      Mr. Brigham has programmed well in prison**

Mr. Brigham's Progress Report dated November 11, 2019[2], demonstrates that he has programmed well in prison.  The BOP wrote, "[Mr.] Brigham arrived at SPC-Tucson on July 10, 2018.   Brigham has managed to maintain clear conduct, GOOD work performance ratings, made all scheduled Financial Responsibility Program payments, and has participated in recommended educational programs while housed at SPC-Tucson." Exhibit 1, p. 73.  The BOP noted that Mr. Brigham programmed at a "high" level while at SPC Tucson.  *Id.* at 74.  Some of his programming included: FDIC Money Management, transitioning interview skills, and educational programs.  *Id.* at 73.  BOP also noted that "Brigham has held a numerous amount of work assignments while incarcerated in the Bureau of Prisons and he has managed to secure and maintain GOOD/OUTSTANDING work performance ratings."  *Id.*  Critically, the BOP determined, "Brigham has managed to maintain clear conduct since December 28, 2010. He has not been a management problem while housed at SPC-Tucson."  *Id.* at 74.

Unlike previous BOP prison sentences, where Mr. Brigham suffered some disciplinary consequences for violations and concerns were raised about him engaging in new business activity outside of the federal prison, Mr. Brigham is now a rule follower:  he

---

[2] The updated "Sentry Date" of 11-21-2019 is indicated in the lower left hand corner of the document.  *See* Exhibit 1, p. 73.

is following prison rules, maintaining clear conduct, trying to address his worsening physical health, improving himself, and hoping to get back to his family.  Mr. Brigham has worked in prison consistently at his assigned jobs.  *Id.* at 78.  He has taken programming aimed to teach himself how to be more responsible about money in order to support himself without resorting to criminal conduct.  *Id.* at 73.  He is making on schedule all of his required financial responsibility payments.  *Id.*  He is disciplinary free.  *Id.*  (noting he has "maintained clear conduct").

### 2.    Mr. Brigham's Medical Conditions

Although Mr. Brigham long suffered from an enlarged prostate and had a stable small cancerous lesion in his prostate, his condition has worsened.  He suffers from a massive prostatic hypertrophy and adenocarcinoma which complicates and endangers his chronic kidney disease.  Exhibit 1, p. 1, 11-12, 14, and 17.[3/]  BOP medical staff treated Mr. Brigham's prostate adenocarcinoma (prostate cancer) during his last prison sentence, and Mr. Brigham's last Prostate-Specific Antigen (PSA) test was 23, apparently deemed non-critical.  Exhibit 1, pp. 11-12.  But during testing on July 27, 2018, BOP medical staff determined his PSA levels rose to 31 and he was suffering from a massive prostatic hypertrophy (massive enlargement of the prostate), raising significant concerns with the BOP medical staff and requiring a consult with an urologist outside of the BOP.  Exhibit 1, pp. 11-12.

---

[3] Mr. Brigham's medical records (Exhibit 1, pp. 1-72) are not the complete collection of medical records but a summary of the records.  The yellow highlighting and markings are notations provided by Mr. Brigham to explain his condition.

Dr. Tristan Berry, an urologist in Tucson, Arizona, performed a biopsy of Mr. Brigham in October of 2018. Exhibit 1, pp. 21-29. Dr. Berry determined that Mr. Brigham's Gleason score was seven, recommending treatment within three months. A Gleason score of six through ten indicates cancer.  Dr. Berry explained four treatment options for Mr. Brigham's prostate cancer: High Intensity Focus Ultrasound (HIFU), brachytherapy, radiation therapy, and cryotherapy.

During a HIFU procedure, doctors bombard focused beams of ultrasound energy or sound waves at the cancerous cells within the prostate, focusing exclusively on the cancerous cells by using an MRI, until the cells are destroyed.  Although HIFU is a new procedure, it is a less invasive procedure and seems to have fewer side effects than alternative treatment forms.  Cryotherapy punctures the skin between the anus and scrotum with needles, reaching into the prostate. Once the needles have been inserted into the anus and scrotum, intensely cold gases are then passed through the needles to freeze and destroy the cancerous cells or prostate. Radiation uses high-energy rays or particles to kill the cancerous prostate cells. Some side effects of radiation can include: radiation proctitis, causing diarrhea, sometimes with blood in the stool, and rectal leakage; radiation cystitis, causing frequent urination, burning sensation during urination, and blood in the urine; urinary incontinence; erectile dysfunction and even impotence; fatigue; and lymphedema or fluid collecting in the legs or genital region over time, causing swelling and pain.  Dr. Berry did not recommend brachytherapy for Mr. Brigham.  Mr. Brigham is not a candidate for brachytherapy given his significant urinary obstructive symptoms. *See* Exhibit 1, p. 31.

Mr. Brigham selected the High Intensity Focus Ultrasound (HIFU), declining radiation and cryotherapy. Dr. Berry does not perform HIFU treatment so his office

referred Mr. Brigham to Dr. Rahul Mehan, an urologist in Phoenix that could perform the HIFU treatment.  At that time and currently, Mr. Brigham is housed at SPC Tucson.[4/] Nurse Practitioner John Harris of Dr. Berry's office indicated if the BOP has not referred Mr. Brigham to a practitioner for HIFU treatment, Dr. Berry's office would recommend Mr. Brigham return to Dr. Berry and opt for cryotherapy which is a one-time procedure that can cure prostate cancer.

It appears BOP approved Mr. Brigham for radiation therapy, and possibly HIFU treatment, but did not approve cryotherapy treatment. But, since the BOP could not find local practitioners in Tucson who could perform the HIFU procedure, and since the BOP will not transport Mr. Brigham to Phoenix to receive medical treatment, despite it being two hours from Tucson, the BOP moved Mr. Brigham across the country to FMC Butner to provide radiation therapy.  Mr. Brigham believed his transport to FMC Butner was another attempt to find a local practitioner that would perform the HIFU procedure because Mr. Brigham declined radiation therapy as a treatment form. He declined radiation because of the number of possible side effects that concerned him including: urinary incontinence and side effects, a bowel side effects (radiation proctitis), and erectile dysfunction and impotence. He also had concerns that radiation may negatively affect the health of his remaining kidney which is in Stage 4 kidney disease (kidney failure).

Despite moving Mr. Brigham to FMC Butner, he continued to decline radiation because of his express concerns over the damaging side effects.  Rather than pivoting to another treatment method, the BOP moved Mr. Brigham back to SPC Tucson.  So,

---

[4] The lower security prison within the USP Tucson complex.

approximately sixteen months removed from Dr. Berry's recommendation that Mr. Brigham receive treatment within three months, Mr. Brigham still is untreated for his severe and worsening prostate cancer.

With prostate cancer and a massive prostatic enlargement, basic urination is painful, but the cancer and prostatic enlargement's effects spread beyond basic urination. Mr. Brigham is unable to sleep most nights due to his need to urinate three to four times a night. Exhibit 1, p. 1.  He also urinates his bed, soaking himself and his sheets, approximately once a month. The BOP staff must provide him replacement sheets after he urinates his bed, and clean urine soaked clothes and bedding.  Frequently waking up in the middle of the night often wakes up his cellmate, and urinating his bed can also cause discomfort for his adult cellmate.

During the day, Mr. Brigham has to urinate frequently when sitting on hard surfaces, a common occurrence while incarcerated.  Sitting down is difficult when he is on a prison bus or prison chair that does not have a padded seat.  His inability to sit on hard surfaces is problematic when he needs to be transported between correctional facilities or to frequent medical appointments.

Mr. Brigham's massive prostatic enlargement and prostatic cancer also make him more prone to urinary tract infections.  He has had three urinary tract infections since his incarceration with the BOP started 22 months ago.  *See e.g.* Exhibit 1, pp. 54-58.  During one of the urinary tract infections, Mr. Brigham suffered from sepsis, a blood stream infection.  Exhibit 1, p. 54.

Mr. Brigham only has one partially functioning kidney; his left kidney was removed in 1979.  Exhibit 1, p. 1.  Dr. Asjad Sardar of the Southwest Kidney Institute diagnosed

Mr. Brigham with kidney disease and the disease has advanced to Stage 4. Exhibit 1, p. 69. The disease transitioned from Stage 3 to Stage 4 shortly before his federal sentence, and the BOP had to retest him and reassess the disease as Stage 4 because his prior kidney functioning indicated he suffered from Stage 3 kidney disease. Exhibit 1, pp. 1-2; 5-6; 11-12; and 67-72.

Mr. Brigham has suffered an episode of syncope, or fainting, and it is unclear whether the fainting is related to his hypertension (high blood pressure) or medication he was given for his hypertension, prostate cancer, kidney disease, or some combination of all three. Mr. Brigham fainted around November 2, 2018 when he got up from his bunk in the night to use the bathroom and became dizzy. Exhibit 1, pp. 37-42. The next thing he remembers is waking up on the ground in the morning, his cellmate helping him up, and finding a laceration to his upper left eyebrow. *Id*. at 37, 40-42. This cut required seven stitches. *Id*. The medical records indicate the emergency room recommended he discontinue the medication hydrochlorothiazide (HCTZ) which he was taking for high blood pressure. Exhibit 1, pp. 40-41. Mr. Brigham nearly suffered a second fainting episode on November 22, 2018, after the hydrochlorothiazide was discontinued. Exhibit 1, pp. 44-46. The BOP sent him to the hospital because he was dizzy, weak, unstable, possibly dehydrated, and nauseous and suffering from diarrhea all day. *Id.*

Mr. Brigham also suffers from osteoarthritis (traumatic arthropathy) of his left knee. Exhibit 1, pp. 1-2. His left knee is has degraded to bone on bone causing him daily discomfort. He needs a total knee replacement because he has difficulty walking and going up and down stairs. Mr. Brigham self-reports that his right knee also suffers from

osteoarthritis, but it does not require a total knee replacement and is not nearly as painful or damaged as the left knee.

Mr. Brigham also suffers from cataracts in both eyes which are causing him vision problems.  Exhibit 1, pp. 12, 64-65. He has very poor vision and reports it is like being in a fog when he is exposed to natural light. The BOP agrees Brigham suffers from cataracts, but determined the limitations these put on his vision are not sufficient to require a surgical consult as of January 2019.  Exhibit 1, p. 65.  Mr. Brigham requested an appointment with an ophthalmologist in January or February of 2019.  He believes an appointment was scheduled for October 2019, but the BOP moved him from FCI Tucson to FMC Butner, interrupting that appointment. It does not appear a follow up appointment has been scheduled.

On January 14, 2020, Mr. Brigham, through counsel, filed a request for compassionate release with Warden von Blanckensee.  Exhibit 3.  The request asked for relief under 18 U.S.C. § 3582(c)(1)(A)(i) and explained extraordinary and compelling reasons existed to reduce Mr. Brigham's sentence under two separate standards.  Under U.S.S.G. §1B1.13, App. N. (1)(A)(ii)(I) and (III),[5] Mr. Brigham's prostate cancer, Stage 4 kidney failure, osteoarthritis, and cataracts qualify as a serious physical or medical condition (I) and as experiencing deteriorating physical or mental health because of the aging process (III). These conditions substantially diminish Mr. Brigham's ability to

---

[5] In a typo, counsel cited the wrong subpart, (II) and not (III), by writing: "U.S.S.G. §1B1.13, App. N. (1)(A)(ii)(I) and **(II)**," rather than "U.S.S.G. §1B1.13, App. N. (1)(A)(ii)(I) and **(III)**.  Later, counsel referenced subpart (III) and included the precise definition to subpart (III).  Exhibit 3, pp. 1, 6 n. 4.

provide self-care within the environment of a correctional facility, and he is not expected to recover from these conditions based on the BOP's proposed treatment plan.

Mr. Brigham explained to the Warden that he also fits the criteria for the BOP's Elderly Inmates with Medical Conditions in the BOP's Program Statement 5050.50, Section 4, Subpart b.  Mr. Brigham is over 65 years of age because he is 72 years old. Mr. Brigham suffers from chronic or serious medical conditions related to the aging process: prostate cancer, Stage 4 kidney disease, osteoarthritis, and cataracts. He is also experiencing deteriorating mental or physical health that substantially diminishes his ability to function in a correctional setting based on these diseases, conventional treatment does not promise substantial improvement for his health, and he has served over 50% of his federal sentence, if one includes good time credits.[6]

On January 23, 2020, Warden von Blanckensee denied the request to file a sentence reduction motion for compassionate release. Applying the BOP's program statement that creates its own standards for "extraordinary and compelling reasons," which differ in some important respects from the Commission's standards, the Warden recognized that Mr. Brigham suffers from medical ailments. But, she noted that Mr. Brigham's medical ailments are and will continue to be treated by the medical staff at SPC Tucson, that Mr. Brigham was transferred to FMC Butner to undergo medical treatment but refused it, and that Mr. Brigham had not served 50% of his "Full Term Sentence".  Exhibit 2.  The Warden

---

[6] The BOP apparently does not.  *See* Exhibit 2 (Warden's denial noting "Brigham has only served 41.9% of his Full Term Sentence ....")  Not counting good time credits, Mr. Brigham will have fully served 50% of his term as of June 18, 2020.

did not address whether Mr. Brigham was eligible under U.S.S.G. §1B1.13, App. N. (1)(A)(ii)(I) and (III).

As part of the First Step Act that President Trump signed on December 21, 2018, Congress removed a major obstacle from judicial review of sentences to determine whether serious medical conditions and declining health due to aging made a sentence reduction "sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a).  Under the Act, this Court is afforded jurisdiction to make the § 3553(a) determination of whether Mr. Brigham's 26 months in prison (30 months including good conduct credit), in light of his age, and other debilitating medical conditions, is "sufficient, but not greater than necessary," to accomplish the goals of sentencing.

3. **COV-19 Dangers to Prisoners Over 60 and with Underlying Chronic Medical Issues**

After Mr. Brigham made his compassionate release request to the Warden, the Centers for Disease Control and Prevention ("CDC") has categorized people like Mr. Brigham as most-at-risk for contracting COVID-19, a dangerous illness spreading rapidly across the world.  As of March 12, 2020, the new strain of coronavirus which causes COVID-19, has infected over 132,300 people, leading to at least 4,954 deaths worldwide.[7]

---

[7] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[8]  The President has declare a national emergency today.[9]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[10]  Such "social isolation" is impossible in a prison setting.  BOP recognizes these concerns to such a degree that it has suspended all visits – social or legal – for 30 days.[11]

## C.     Mr. Brigham's Serious Medical Conditions And Deteriorating Physical Health Because Of The Aging Process Constitute Extraordinary And Compelling Reasons Warranting A Sentence Reduction

Mr. Brigham meets the threshold requirement of "extraordinary and compelling reasons" because he has serious medical conditions and is experiencing deteriorating physical health because of the aging process within the meaning of Application Note 1(A)(ii)(I) and (III) of U.S.S.G. § 1B1.13.  Mr. Brigham suffers from prostate cancer and a massive prostate enlargement, Stage 4 kidney disease while only having one partially

---

[8] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

[9]  *Trump declares a national emergency, "two very big words."* The New York Times (March 13, 2020), *at* https://nytimes.com/2020/03/13/world/coronavirus-news-live-updates.html#link-37509802 (last accessed March 13, 2020).

[10] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

[11] *Federal Bureau of Prisons COVID-19 Action Plan*, at https://www.bop.gov/resources/news/20200313_covid-19.jsp (last accessed March 13, 2020).

functioning kidney, osteoarthritis, and cataracts, and he is 72 years old.  These medical conditions substantially diminish his ability to provide self-care in a correctional environment, and he is not expected to recover based on the BOP's treatment offerings and plan.  *See* U.S.S.G. §1B1.13, App. N. (1)(A)(ii)(I) and (III).  Currently, three of these conditions are currently receiving little or no treatment in the BOP, and the other two may have been mistreated or improperly medicated by the BOP.

The medical staff at BOP and Dr. Berry determined Mr. Brigham's prostate cancer escalated from a benign concern, to serious cancer in October of 2018, sixteen months ago, but Mr. Brigham has not received the requested medical treatment to address this cancer. Dr. Berry wanted Mr. Brigham to receive treatment within three months of October of 2018.  He approved Mr. Brigham for the HIFU procedure and made a referral Dr. Mehan in Phoenix to complete the procedure.   But Mr. Brigham has not received the HIFU treatment.   Mr. Brigham has a serious and well-considered reason to reject radiation treatment that was offered him – the high risk of damage to his only kidney which is already damaged by stage IV chronic kidney disease.

Meanwhile, Mr. Brigham has experienced worsening symptoms from the prostate cancer and a massive prostate enlargement. He often wakes up in the middle of the night to pee, as frequently as three to four times a night. As a 72 year old man, he wets the bed because he cannot control his urination.   This causes discomfort for Mr. Brigham's cellmate and embarrassment for Mr. Brigham because he must notify the BOP staff that he urinated the bed again and carry soiled sheets past other inmates to the BOP staff to get clean sheets.   Mr. Brigham suffers through painful, uncomfortable, and even dangerous reoccurring urinary tract infections.  And sitting on hard surfaces, like prison chairs or seats

17

on a prison bus, causes him distress and triggers the need to urinate. Unfortunately, prison is not a setting that allows a person to handle his or her suffering privately, or the freedom to avoid scenarios that would trigger the onset of symptoms that Mr. Brigham's prostate cancer and massive prostate enlargement causes.

For a seventy two year old man who has taken care of himself his whole life, his prostate cancer and enlargement is robbing him of his dignity and ability to care for himself. This discomfort, shame, and pain constitutes an extraordinary and compelling circumstance. *See United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488 (S.D. Ind. May 9, 2019) (finding the defendant served much of his sentence while seriously ill and in physical discomfort, including kidney failure, meaning his sentence has been significantly more laborious than that served by most inmates and meaning further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)). Given Mr. Brigham does not have the freedom to access treatment or better treatment options within the BOP, he cannot cure his prostate cancer. And being unable to treat the source of these symptoms, he cannot provide basic self-care because he cannot remedy the constant need to urinate, prevent wetting the bed, prevent future urinary tract infections, or prevent more fainting episodes that cause him physical harm like splitting his head open.

Given the Gleason score of 7 and his lack of treatment, there is also a risk that Mr. Brigham's prostate cancer has or will metastasize to other organs. If the prostate cancer metastasizes to other organs, his health will further deteriorate. His prospects of a recovery become worse, and any medical procedures will become more complex and expensive. And prostate cancer always poses a risk of reoccurrence, even with successful treatment.

Mr. Brigham and the BOP would constantly need to monitor his health for signs of reoccurrence.  Detecting a reoccurrence could also come too late for Mr. Brigham if the prostate cancer worsens or spreads to other organs.

Combining Mr. Brigham's prostate cancer with Stage 4 kidney disease, hypertension, osteoarthritis, and cataracts further complicates an already extraordinary and compelling medical situation. For example, Mr. Brigham's fainting episodes. The emergency room recommended hydrochlorothiazide be removed from the medication regiment the BOP provides Mr. Brigham. Hydrochlorothiazide treats hypertension, but should not be taken by someone suffering from kidney disease. The BOP should have reevaluated whether hydrochlorothiazide continued to be an appropriate medication for Mr. Brigham given his kidney disease earlier and removed it from his medication regiment. It's unclear if the medication caused the fainting and fall, leading to a large laceration over his left eye, or the medication and some combination of his medical ailments.  There was nearly a second fainting episode approximately two weeks after hydrochlorothiazide was discontinued, so it appears the root of the problem lies with Mr. Brigham's combination of serious health conditions.

Another example is Mr. Brigham's urinary tract infections. Typically, urinary tract infections are treated with antibiotics.  But, Mr. Brigham cannot take or must be careful with antibiotics because antibiotics can harm kidneys.  Mr. Brigham has one partially functioning kidney vulnerable with Stage 4 kidney disease, so Mr. Brigham's lack of medical care for his prostate cancer triggers urinary tract infections, triggering a need for antibiotics, and damages his only remaining and weakened kidney.

And regardless of the lack of treatment Mr. Brigham has received for his prostate cancer, he is suffering from kidney disease, which is not curable. The disease has already progressed from Stage 3 to Stage 4 sometime after the conclusion of his initial BOP sentence and before his supervised release sentence.  If the disease transitions to Stage 5, Mr. Brigham will have no working kidneys and will be kept alive artificially through the use of dialysis machines.  Absent a kidney donation, Mr. Brigham will be hooked up to a dialysis machine until he eventually succumbs to the disease.

The BOP's response to Mr. Brigham's request for compassionate release indicated that Mr. Brigham's medical ailments are being adequately treated at SPC Tucson, but examining his medical history reveals Mr. Brigham's combination of medical conditions are not being adequately treated or, in some cases, even addressed.  Hydrochlorothiazide is an improper medication for someone with kidney disease, so the treatment the BOP was providing Mr. Brigham possibly caused an emergency room visit and risked damaging or did damage his remaining kidney.  If Mr. Brigham did not pass out and split his head open, the BOP might still be providing Mr. Brigham a medication that is damaging to his remaining kidney.  Radiation therapy does not equate to substantial improvement for Mr. Brigham's wide array of medical needs.  Further, while serving his federal sentence, Mr. Brigham's prostate cancer was "lost to follow up" for a four year period.  Such monitoring failed to present his prostate illness from moving to a more active form of cancer along with a massive enlargement.

The BOP's treatment proposals do not promise a substantial recovery. Radiation therapy is a risky and an intensive procedure that lasts for eight weeks with daily treatment, excluding weekends. Radiation therapy risks numerous side effects which can cause

serious and painful urinary and bowel problems and erectile dysfunction and impotence. These side effects can be permanent and risk adversely affecting how Mr. Brigham will live his life after his federal sentence. Critically, there is fear that radiation could cause further damage to Mr. Brigham's remaining kidney, escalating his kidney disease from Stage 4 to Stage 5. Once he progresses to Stage 5 kidney disease, his only hope is dialysis treatment and a going on the organ donor list for a possible kidney donation.

And, Dr. Berry referred Mr. Brigham to Dr. Mehan in Phoenix to receive the HIFU treatment, not radiation. When Dr. Berry's office was informed that Mr. Brigham still has not received his approved HIFU treatment, Nurse Practitioner John Harris advised that Mr. Brigham should return for a consult on a possible cryotherapy treatment, not radiation. But, the BOP refuses to allow cryotherapy. Although Mr. Brigham chose HIFU when presented with his treatment options, it is significant that the medical practitioners are not recommending radiation.

Finally, the BOP has made little to no progress in providing Mr. Brigham medical care for his cataracts and worsening vision. The BOP is also not proactively addressing Mr. Brigham's osteoarthritis in his left knee, including his need for a left knee replacement. These two conditions can and are only worsening with time and age.

The COVID-10 pandemic now adds its complication to Brigham's chronic and deteriorating medical conditions.  Brigham is clearly in the CDC's high-risk population. CDC advises such people to "take everyday precautions to keep space between yourself and others," to "clean your hands often," and to "avoid crowds, especially in poorly ventilated spaces."   Brigham has no control over who he is exposed to or how crowded

the conditions are at his prison.  But his risks of a fatal outcome should he be exposed to COVI-19 are much higher than a younger or healthier person.

In sum, conventional medical care does not promise substantial improvement to his serious physical condition and deteriorating physical health caused by age.[12]

## D.   Release Plan

Mr. Brigham has a stable home to return to with supportive and loving family that will help him care for his medical needs.  If released, he would return to Fresno, California to reside with his wife, Claudia Igarik.  He would live at their home, located in Fresno, CA 93705. Claudia would help care for Mr. Brigham.  Mr. Brigham is open to being placed at his home on home confinement to complete his sentence.

Mr. Brigham plans to meet with a kidney specialist named Dr. Khin Su Yee with Ace Nephrology in Fresno to address his kidney disease. He also plans to travel to the Chicago Prostate Center to treat his prostate cancer and massive prostate enlargement but is also open to any hospital or medical provider where he can receive the HIFU procedure to treat his cancer. Mr. Brigham is insured by Medicare which will cover the costs of his medical procedures and treatment.

---

[12] Mr. Brigham also fits the criteria for compassionate release established in the BOP's Elderly Inmates with Medical Conditions in the BOP's Program Statement 5050.50, Section 4, Subpart b. The BOP contested whether the BOP could provide conventional medical care to spark substantial improvement in Mr. Brigham's physical well-being and whether Mr. Brigham served 50% of his sentence. For the reasons stated above, Mr. Brigham is not and cannot be provided conventional medical care that would substantially improve his physical health, and he has served approximately 30 months of his 60 month sentence, including good time. With a full good time reduction, Mr. Brigham would only need to serve 25.5 months on a 60 month sentence. No evidence suggests Mr. Brigham has lost any good time credit to date, and his BOP Progress Reports indicate he has had no disciplinary infractions from November of 2018 through November of 2019.

Mr. Brigham will also be able to receive support through the Social Work Team at the Federal Defender's Office in Sacramento, who will provide service coordination, reentry support, and case-related assistance. The Social Worker is Crystal Richardson in the Sacramento office.

**V.**

**ARGUMENT**

**A.     MR. BRIGHAM HAS ESTABLISHED EXTRAORDINARY AND COMPELLING REASONS WARRANTING A SENTENCE REDUCTION**

Under § 3553(a), the extraordinary and compelling reasons, under both the BOP and Sentencing Commission descriptions, warrant sentence reduction based on the characteristics of the defendant, the need for effective and supportive environment for medical care, and the accomplishment of the deterrence and public safety purposes of sentencing. The time already served has met many of the original sentencing goals to deter Mr. Brigham from new criminal conduct because Mr. Brigham utilized his prison sentence to improve himself and focus on his health and family and maintained clear conduct while in the BOP's custody.

In Mr. Brigham's Progress Report dated November 11, 2019, the BOP wrote, "[Mr.] Brigham arrived at SPC-Tucson on July 10, 2018. Brigham has managed to maintain clear conduct, GOOD work performance ratings, made all scheduled Financial Responsibility Program payments, and has participated in recommended educational programs while housed at SPC-Tucson." Exhibit 1, p. 73. The BOP noted that Mr. Brigham programmed at a "high" level while at SPC Tucson. *Id* at 74. Some of the programming included: FDIC Money Management, transitioning interview skills, and some educational programs. *Id.* at

23

73.  The BOP also noted, "Brigham has held a numerous amount of work assignments while incarcerated in the Bureau of Prisons and he has managed to secure and maintain GOOD/OUTSTANDING work performance ratings."  *Id*. at 73. Critically, the BOP determined, "Brigham has managed to maintain clear conduct since December 28, 2010. He has not been a management problem while housed at SPC-Tucson." *Id*. at 74.

Unlike previous BOP prison sentences where Mr. Brigham suffered some disciplinary consequences for violations and concerns were raised about him engaging in new business activity outside of the federal prison, currently, Mr. Brigham is following the rules, maintaining clear conduct, trying to address his worsening physical health, improving himself, and hoping to get back to his family.  Mr. Brigham is working in prison, taking programming and programming about how to be more responsible about money to support himself without resorting to criminal conduct, paying his required financial responsibility payments, and following the rules.  At age 72, Mr. Brigham is not getting any younger.  He has served nearly 27 months of actual time, equivalent to more than 30 months with good conduct credit. The § 3553(a) factors support a sentence of time served.

Although the Court weighed the applicable § 3553(a) factors at the time of sentencing and evidence was presented to the Court about Mr. Brigham's physical health, Mr. Brigham's medical situation has worsened since this Court sentenced him.  Namely, he is dealing with prostate cancer, a massive prostatic enlargement, and the complications these two illnesses create for his Stage 4 kidney disease, hypertension, osteoarthritis, and cataracts.  The prostate adenocarcinoma's transition from a single lesion of little concern to a serious risk occurred during Mr. Brigham's time the BOP custody.  So, any factoring of Mr. Brigham's medical status into his sentence previously does not control the Court's

consideration of this motion, and the Court should reassess Mr. Brigham's sentence in light of his worsening physical health, time served in custody, and post-offense rehabilitation.

**B.    THE AMENDED COMPASSIONATE RELEASE STATUTE REFLECTS A MORE EXPANSIVE CONSIDERATION FOR COMPASSIONATE RELEASE**

Congress's expansion of the compassionate release statute by § 603(b) of the First Step Act reflects congressional intent for the courts to have and exercise greater flexibility to reduce sentences when changed circumstances justify a second look. The title of the amendment, "Increasing the Use and Transparency of Compassionate Release," encapsulates that intent. The evolving case law demonstrates that courts have construed the eligibility standards generously to effectuate congressional intent. Significantly, courts have granted release to defendants with convictions for serious crimes and with histories of violence, finding that changed health circumstances, post-offense rehabilitation, and carefully-crafted conditions of supervised release ameliorate public safety concerns.

In *United States v. Bailey*, for example, the defendant had served 25 years of a 30-year sentence imposed in 1994 for "an extensive racketeering scheme," including a specific finding that the defendant committed offenses relating to a murder. No. 1:94-cr-00481 (N.D. Ill. July 24, 2019) (slip op. at 1) (attached). The parties agreed that the defendant, who was almost 90 years old and suffered from several health issues, had satisfied the statutory requirements for compassionate release. However, the government opposed release on discretionary grounds due to the "reprehensible nature of the offenses" and the defendant's continued denial of responsibility. *Id.* The district court acknowledged that the defendant's criminal history and his serious offense conduct supported the government's position, but the court also looked to more recent factors—the defendant's

25

institutional adjustment, lack of disciplinary infractions, his current age, and his release plan—and concluded that they "point in the opposite direction[.]" *Id.* Therefore, the court granted relief, concluding that release would not minimize the severity of the offense because the defendant had already served most of the sentence imposed. *Id.* (slip op. at 2).

In *United States v. Spears*, the district court granted compassionate release to Adolph Spears, who was serving a 30-year sentence for being the leader of a "major drug conspiracy." No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019). As recounted in the opinion, Spears's history included crimes of violence, his performance on supervision in the past had been poor, and he committed the present serious offense while in his fifties.

> The government argues that Spears is a danger because the crime of conviction was a large drug conspiracy, he possessed guns during the drug conspiracy, he was arrested in 1960 for manslaughter (he was not convicted, and it is unclear if he was even tried for this crime), he was convicted in 1965 of resisting arrest and disorderly conduct, **he was investigated in 1978 for tax evasion and offered a man $500 to burn down an IRS agent's house in the evening when the agent would likely be home and was then convicted of conspiracy to commit murder**, for which he was sentenced to 25 years, he was convicted in 1990 (after being released early from the sentence for the murder conspiracy conviction) of possession of a controlled substance, and after he was released he became part of the underlying drug conspiracy. The government argues that Spears' age and medical conditions do not render him "so incapacitated" that he could not resume his former criminal conduct. The government notes that when Spears was in his fifties, he was a leader of a major drug conspiracy.

*United States v. Spears*, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019) (emphasis added).  However, at the time of the request for compassionate release, Spears was 76 years old and suffered from "multiple chronic serious medical conditions and limited life expectancy." *Id.* at *1. Although the government argued that Spears remained a danger to the community, the court disagreed.  The court concluded that, in

light of the defendant's strong family support, the age of his prior convictions, and his diminished physical condition, "appropriate supervision conditions can mitigate any limited risk" to public safety. *Id.* at *5.

Similarly, in *United States v. McGraw*, the court granted compassionate release from the defendant's life sentence for a drug trafficking conspiracy based on the defendant's serious health concerns and diminished ability to provide self-care under commentary note 1(A)(ii) of § 1B1.13. No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488 (S.D. Ind. May 9, 2019). The defendant, who was approximately 55 years old at the time of the offense, was 72 years old at the time of the opinion and suffered from limited mobility, diabetes, and chronic kidney disease. *Id.* at *2. Although the court noted that many of Mr. McGraw's conditions were "fairly well managed or controlled through the medical treatment [he] receive[d] while incarcerated," he continued to suffer from other conditions that the institution could not adequately address. *Id.* at *2-3. The court found "it highly pertinent that Mr. McGraw's conditions require frequent monitoring, evaluation, and treatment." *Id.* at *4.

The government in McGraw argued that the defendant remained a danger to the community because of his leadership in the Diablos Motorcycle Gang, noting that he could continue his criminal activity with simple access to a telephone. *Id.* at *4. The court, however, concluded that, given "Mr. McGraw's frail condition," the court could impose conditions that would reasonably assure the safety of the community, such as requiring no contact with anyone engaged in criminal activity. *Id.* With respect to the § 3553(a) sentencing factors, the Court concluded that the "significant sanction" the defendant had already served (17 years) was sufficient.

27

But further incarceration is not needed to deter Mr. McGraw from further offenses; nor, for the reasons described above, is it necessary to protect the public from future crimes. Finally, Mr. McGraw has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2).

*Id.* at *5. The Court imposed lifetime supervision to "continue to serve as a sanction and general deterrent, appropriately recognizing the seriousness of Mr. McGraw's conduct." *Id.* at *4.

Although each case must be assessed on its unique facts, the district courts' approach of expanding the use of compassionate release, consistently with the congressional intent of the First Step Act, has resulted in sentence reductions for many other defendants whose extraordinary and compelling circumstances affect the current sentencing calculus, despite prior serious offenses and/or criminal histories. *See, e.g.*, *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *3 (N.D. Ohio Oct. 17, 2019) (granting compassionate release to a 34-year-old veteran convicted of bank robbery who sought release to aid his ill mother); *United States v. Bellamy*, CV151658JRTLIB, No. 2019 WL 3340699, at *6 (D. Minn. 2019) (granting compassionate release based on current "serious health issues" to a career offender convicted and sentenced in 2017 at age 69 for conspiracy to distribute heroin).

**VI.**

**CONCLUSION**

28

1
2          For the foregoing reasons, Mr. Brigham respectfully requests that the Court grant
3   the requested reduction in sentence.
4   Dated:  March 13, 2020
                                                    Respectfully submitted,
5
6                                                   HEATHER E. WILLIAMS
                                                    Federal Defender
7
                                                    /s/  Ann C. M<sup>c</sup>Clintock
8                                                   Attorney for Defendant
                                                    CLIFFOD BRIGHAM
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28